## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| IN RE: GLYBURIDE CASES | HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO: | LEAD CASE: 16-GL-27240<br>DIRECT CASE: 16-GL-27241 |
| *ALL GLYBURIDE DIRECT PURCHASER ACTIONS* | JURY TRIAL DEMANDED |
| AHOLD USA, INC.; CÉSAR CASTILLO, INC.; FWK HOLDINGS, L.L.C.; KPH HEALTHCARE SERVICES, INC., a/k/a KINNEY DRUGS, INC.; and ROCHESTER DRUG CO-OPERATIVE, INC.; on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AUROBINDO PHARMA USA, INC.; CITRON PHARMA, LLC; HERITAGE PHARMACEUTICALS, INC.; and TEVA PHARMACEUTICALS USA, INC.,<br><br>Defendants. | |

## CONSOLIDATED DIRECT PURCHASER CLASS ACTION COMPLAINT

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT
TO MDL 2724 PROTECTIVE ORDER

# <u>TABLE OF CONTENTS</u>

Page

I.  INTRODUCTION ...................................................................................................1

II. JURISDICTION AND VENUE ...........................................................................6

III. PARTIES ...............................................................................................................7

    A.  Plaintiffs ........................................................................................................7

    B.  Defendants .....................................................................................................8

    C.  Co-Conspirators ............................................................................................9

IV. INTERSTATE TRADE AND COMMERCE ...................................................10

V.  FACTUAL ALLEGATIONS .............................................................................11

    A.  The Generic Drug Market Is a Commodities Market, Where Competition
        Historically Has Been Keen. ......................................................................11

        1.  Generic drugs should lead to lower prices. ....................................11

        2.  Prescription drug prices in the United States are governed by institutional
            safeguards, which are intended to keep drug prices competitive..............13

    B.  Defendants Orchestrated Their Conspiracy Through In-Person Meetings and
        Other Forms of Communication. ...............................................................17

        1.  Defendants' conspiracy was furthered by discussions held at meetings and
            industry events. ..............................................................................17

        2.  Defendants' specific anticompetitive communications and activities. ......30

    C.  Defendants' Conduct in Generic Drug Pricing Is Under Investigation by the
        United States Congress, the DOJ, and the State Attorneys General. ....................33

        1.  Congress launched an investigation in response to news reports of a
            dramatic rise in price of certain generic drugs...........................................33

        2.  The DOJ launched a broad criminal investigation into anticompetitive
            conduct by generic drug manufacturers. ....................................................34

        3.  Led by the State of Connecticut, 45 attorneys general launched their own
            investigation of antitrust violations in the generic drug industry. .............39

VI. THE GLYBURIDE MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION ...........42

VII.    CLASS ACTION ALLEGATIONS ...............................................................................44

VIII.   ANTITRUST INJURY .................................................................................................46

IX.     CLAIM FOR RELIEF – VIOLATION OF SECTION 1 OF THE SHERMAN ACT ......47

X.      PRAYER FOR RELIEF ...............................................................................................48

XI.     JURY TRIAL DEMANDED .........................................................................................49

## I.      INTRODUCTION

1.      Plaintiffs Ahold USA, Inc., César Castillo, Inc., FWK Holdings, L.L.C., KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc., and Rochester Drug Co-Operative, Inc., on behalf of themselves and all others similarly situated, bring this Class Action Complaint on behalf of a Class (defined below) of direct purchasers who purchased glyburide 1.25, 2.5, or 5 mg tablets ("Glyburide") directly from Defendants Aurobindo Pharma USA, Inc., Citron Pharma, LLC, Heritage Pharmaceuticals, Inc., or Teva Pharmaceuticals USA, Inc.

2.      In the pharmaceutical industry, the entry of generic versions of branded drugs usually results in aggressive price competition, which in turn reduces prices for drug wholesalers, retail pharmacies, consumers, and third party payors.  Defendants here, however, conspired to thwart the economic benefits of generic competition.

3.      This is a civil action seeking treble damages arising out of the Defendants' unlawful scheme to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Glyburide.  As set forth below, Defendants' scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1.  Defendants were not alone in subverting the operation of a competitive marketplace for generic pharmaceuticals.  Defendants' anticompetitive conduct in the Glyburide market is part of a larger conspiracy or series of conspiracies involving many generic pharmaceutical manufacturers and many generic pharmaceuticals.

4.      Plaintiffs' allegations are based on personal knowledge of these matters relating to themselves and upon information and belief as to all other matters.  Parts of Plaintiffs' allegations are based on information made public during ongoing government investigations of Defendants and other generic pharmaceutical companies for alleged unlawful price-fixing and other conduct in the generic pharmaceutical industry.

5.      Glyburide is a commonly prescribed oral anti-diabetic medication used to treat high blood sugar levels caused by Type 2 diabetes.

6.      Glyburide has been available in the United States for decades and the market for Glyburide is mature.  Defendants dominate the market for Glyburide.

7.      Beginning in approximately April 2014 and continuing today (the "Class Period"), Defendants and co-conspirators engaged in an overarching anticompetitive scheme to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Glyburide through unlawful agreement.  Defendants orchestrated their conspiracy through secret communications and meetings, both in private and at public events, such as trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (now called the Association for Accessible Medicines),[1] the Healthcare Distribution Management Association ("HDMA") (now called the Healthcare Distribution Alliance), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), the National Association of Chain Drug Stores ("NACDS"), Efficient Collaborative Retail Marketing ("ECRM"), and the National Pharmacy Forum ("NPF"), among others.

8.      Defendants' and other generic pharmaceutical manufacturers' conduct has resulted in extensive scrutiny by federal and state regulators, including by the Antitrust Division of the United States Department of Justice ("DOJ"), the United States Senate, the United States House of Representatives, and 45 attorneys general from at least 44 states and the District of Columbia (the "State AGs").  The DOJ empaneled a federal grand jury in this District, which has issued subpoenas relating to price-fixing and other anticompetitive conduct in the generic

---

[1] *See* Russell Redman, *New name for Generic Pharmaceutical Association*, CHAIN DRUG REVIEW (Feb. 14, 2017), *available at* http://www.chaindrugreview.com/new-name-for-generic-pharmaceutical-association/.

pharmaceutical industry, including to Defendants Citron and Teva.  As discussed below,

Glyburide is known to be a focus of these investigations, which have resulted in criminal guilty

pleas concerning glyburide.

9.      The DOJ's and State AGs' investigations followed a congressional hearing and

investigation prompted by the National Community Pharmacists Association's ("NCPA")

January 2014 correspondence to the United States Senate Health Education Labor and Pensions

("HELP") Committee and the United States House Energy and Commerce Committee requesting

hearings on significant spikes in generic pharmaceutical pricing.[2]  The NCPA's news release

reported price hikes on essential generic pharmaceuticals exceeding 1,000% in some instances,

according to its survey of over a thousand community pharmacists, resulting in some patients

being forced to leave their prescriptions at the pharmacy counter due to increased copays, and

forcing more seniors into Medicare's coverage gap (or "donut hole") where they must pay far

higher out-of-pocket costs.

10.      On December 12 and 13, 2016, the DOJ filed its first criminal charges against two

former executives of Defendant Heritage: Jeffrey Glazer and Jason Malek.  *See United States of

America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v.

Jason T. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).  The DOJ alleged that both Glazer and

Malek conspired with others "to allocate customers, rig bids, and fix and maintain prices" of

Glyburide and generic doxycycline sold in the United States.  Each was charged with two felony

counts under the Sherman Act (15 U.S.C. §1).  On January 9, 2017, both Glazer and Malek

---

[2] News Release, *Generic Drug Price Spikes Demand Congressional Hearing, Pharmacists Say* (Jan. 8, 2014), *available at* http://www.ncpanet.org/newsroom/news-releases/2014/01/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say.

pleaded guilty to the charges.  Each pled that between April 2014 and continuing until at least

December 2015:

> [T]he defendant participated in a conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, including glyburide, the primary purpose of which was to allocate customers and fix and maintain prices of glyburide sold in the United States. In furtherance of the conspiracy, the defendant and his co-conspirators at [Heritage], including individuals the defendant supervised, engaged in discussions and attended meetings with co-conspirators involved in the production and sale of glyburide. During such discussions and meetings, agreements were reached to allocate customers and fix and maintain the prices of glyburide sold in the United States.[3]

11.     Glazer and Malek continue to cooperate with the DOJ's ongoing investigation as

they await sentencing.

12.     The DOJ has publicly acknowledged that its investigation overlaps with MDL

2724.  For example, the DOJ filed a motion for a stay of discovery in MDL 2724 noting that:

> Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (including a significant number of the drugs at issue here).[4]

13.     Soon after the DOJ filed criminal charges, 20 state attorneys general led by the

State of Connecticut sued the generic manufacturer Defendants here, Aurobindo, Citron,

Heritage, and Teva, for bid rigging, price-fixing and market and customer allocation in

connection with their sale of Glyburide and generic doxycycline in the United States.  On March

1, 2017, the complaint in the State AGs' action was amended to, *inter alia*, add claims of an

---

[3] Plea Agreement, *United States v. Glazer*, No. 16-cr-506, ECF 18 (E.D. Pa. Jan. 9, 2017) at ¶ 4(c); Plea Agreement, *United States v. Malek*, No. 16-cr-508, ECF 17 (E.D. Pa. Jan. 10, 2017), at ¶ 4(c).

[4] *See* Intervenor United States' Motion to Stay Discovery, *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).

additional 20 state attorneys general, bringing the total number of state AGs prosecuting the

action to 40.  Glazer and Malek entered into settlement agreements with the attorneys general on

March 16, 2017.[5]  Commenting on the scope of its current antitrust investigation, the

Connecticut Attorney General ("CTAG") George Jepsen stated that "[t]he issues we're

investigating go *way beyond* the two drugs and six companies.  *Way beyond…We're learning*

*new things every day*."[6]  On July 17, 2017, 5 additional attorneys general joined the action by

filing a nearly identical complaint and a notice of related case.[7]

14.     As noted above, the State AGs' and DOJ's investigations are ongoing.  Just last

week, Pfizer Inc. reported in an SEC filing dated August 10, 2017 that:

> As of July 2017, the U.S. Department of Justice's Antitrust Division
> is investigating our Greenstone generics business.  We believe this
> is related to an ongoing antitrust investigation of the generic
> pharmaceutical industry.  The government has been obtaining
> information from Greenstone.

15.     This Complaint alleges specific communications made between Heritage and each

of its co-conspirators between April and June 2014, culminating in an agreement among all

Defendants to raise prices by approximately 200%.

16.     As a result of Defendants' scheme to fix, maintain, and stabilize prices, rig bids,

and engage in market and customer allocation of Glyburide, direct purchasers paid, and continue

to pay, supracompetitive prices for Glyburide.

---

[5] John Kennedy, *Ex-Heritage Execs to Help States Probe Drug Price-Fixing*, Law360 (May 24, 2017), *available at* https://www.law360.com/competition/articles/927899/ex-heritage-execs-to-help-states-probe-drug-price-fixing?nl_pk=eb0b62b3-08e3-46ed-ac8a-7ab5fa616c07&utm_source=newsletter&utm_medium=email&utm_campaign=competition.

[6] Liz Szabo, et al., *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, The Daily Beast (Dec. 21, 2016), *available at* http://thebea.st/2haV9xg (emphasis added).

[7] *Arkansas v. Aurobindo Pharma USA, Inc.*, No. 17-cv-1180 (D. Conn.).

17.     Plaintiffs, on behalf of themselves and members of a direct purchaser class, seek

damages caused by Defendants' and co-conspirators' violations of Section 1 of the Sherman Act,

15 U.S.C. § 1.

## II.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action as it arises under

Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

19.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C.

§ 1391(b), (c) and (d), because during the Class Period Defendants transacted business

throughout the United States, including in this District; Defendants resided, transacted business,

were found, or had agents within this District, and a portion of the affected interstate trade and

commerce discussed below was carried out in this District.

20.     During the Class Period, Defendants sold and distributed generic pharmaceuticals

in a continuous and uninterrupted flow of interstate commerce, which included sales of

Glyburide in the United States, including in this District.  Defendants' conduct had a direct,

substantial, and reasonably foreseeable effect on interstate commerce in the United States,

including in this District.

21.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each

Defendant: (a) transacted business throughout the United States, including in this District;

(b) participated in the selling and distribution of Glyburide throughout the United States,

including in this District; (c) had and maintained substantial contacts within the United States,

including in this District; and/or (d) was engaged in an unlawful conspiracy to fix, maintain, and

stabilize prices, rig bids, and engage in market and customer allocation of Glyburide that was

directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

### III.   PARTIES

**A.   Plaintiffs**

22.   Plaintiff Ahold USA, Inc. ("Ahold") is a Maryland corporation with its principal places of business in Quincy, Massachusetts and Carlisle, Pennsylvania.  During the Class Period, Ahold purchased Glyburide directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, Ahold paid supracompetitive prices for its Glyburide purchases and was injured by the illegal conduct alleged herein.

23.   Plaintiff César Castillo, Inc. ("CCI") is a Puerto Rico corporation with its principal place of business in Rio Piedras, Puerto Rico.  During the Class Period, CCI purchased Glyburide directly from one or more Defendants.  As a result of Defendants' antitrust conspiracy, CCI paid supracompetitive prices for its Glyburide purchases and was injured by the illegal conduct alleged herein.

24.   Plaintiff FWK Holdings, LLC ("FWK") is an Illinois corporation with its principal place of business in Glen Ellyn, Illinois.  FWK is the assignee of antitrust claims possessed by Frank W. Kerr Company ("Kerr") and brings this action as successor-in-interest to Kerr's claims arising from its purchase of Glyburide directly from one or more of the Defendants during the Class Period.  As a result of Defendants' antitrust conspiracy, FWK, through assignor Kerr, paid supracompetitive prices for its Glyburide purchases and was injured by the illegal conduct alleged herein.

25.   Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. ("KPH") is a New York corporation with its principal place of business in Gouverneur, New York.  KPH operates retail and online pharmacies in the Northeast under the name Kinney Drugs, Inc.

During the Class Period, KPH directly purchased Glyburide from one or more of the Defendants. As a result of Defendants' antitrust conspiracy, KPH paid supracompetitive prices for its Glyburide purchases, and KPH was injured by the illegal conduct alleged herein.

26.     Plaintiff Rochester Drug Co-Operative, Inc. ("RDC") is a New York corporation with its principal place of business in Rochester, New York.  During the Class Period, RDC purchased Glyburide directly from one or more of the Defendants at artificially and unlawfully inflated prices.  As a result of Defendants' antitrust conspiracy, RDC paid supracompetitive prices for its Glyburide purchases, and RDC was injured by the illegal conduct alleged herein.

**B.     Defendants**

27.     Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a Delaware corporation with its principal place of business in East Windsor, New Jersey. Aurobindo has an ongoing partnership with Citron, whereby Aurobindo manufactures Glyburide, which Citron then sells under its trade dress. During the Class Period, Aurobindo sold Glyburide to purchasers in this District and throughout the United States.

28.     Defendant Citron Pharma, LLC ("Citron") is a New Jersey corporation with its principal place of business in East Brunswick, New Jersey. In December 2016, Aceto Corporation acquired generic products and related assets of Citron. During the Class Period, Citron sold Glyburide to purchasers in this District and throughout the United States.

29.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey.  Heritage is a subsidiary of Emcure Pharmaceuticals Limited, an Indian pharmaceutical company.  During the Class Period, Heritage sold Glyburide to purchasers in this District and throughout the United States.

30.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.  Teva is a subsidiary of Teva

Pharmaceutical Industries Limited, an Israeli pharmaceutical company with its principal place of business located in Petach Tikva, Israel.  During the Class Period, Teva sold Glyburide to purchasers in this District and throughout the United States.

31.     Defendants and their officers, agents, employees, or representatives have engaged in the conduct alleged in this Complaint while actively involved in the management of Defendants' business and affairs.

**C.     Co-Conspirators**

32.     Various other persons, firms, entities, and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

33.     The true names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiffs.  Plaintiffs may amend this Complaint to allege the true names and capacities of additional co-conspirators as they are discovered.

34.     At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described herein.

35.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

36.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents,

employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## IV.   INTERSTATE TRADE AND COMMERCE

37.    Defendants are the leading manufacturers and suppliers of Glyburide sold in the United States.

38.    Glyburide is produced by or on behalf of Defendants or their affiliates in the United States or overseas.

39.    During the Class Period, Defendants, directly or through one or more of their affiliates, sold Glyburide throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

40.    The activities of Defendants and their co-conspirators were within the flow of, intended to, and had a substantial effect on interstate commerce in the United States.

41.    Defendants' and their co-conspirators' conduct, including the marketing and sale of Glyburide, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

42.    The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce in that Defendants deprived Plaintiffs of the benefits of free and open competition in the purchase of Glyburide within the United States.

43.    Defendants' agreement to inflate, fix, maintain, or artificially stabilize prices, rig bids, or engage in market and customer allocation of Glyburide, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing Glyburide prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## V.    FACTUAL ALLEGATIONS

### A.    The Generic Drug Market Is a Commodities Market, Where Competition Historically Has Been Keen.

#### 1.    Generic drugs should lead to lower prices.

44.    Generic drugs provide a lower-cost but bioequivalent alternative to brand drugs. Before any generic drug can be marketed, the Food and Drug Administration (the "FDA") requires rigorous testing to ensure it has the same strength, quality, safety, and performance as the brand.  By law, generics must have the same amount of active ingredient and must be "therapeutically equivalent" to the brand, meaning they must meet exacting bioequivalence testing specifications so patients can expect "equal effect and no difference when [generics are] substituted for the brand name product."[8]

45.    To encourage the production and sale of generic drugs, the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") simplified the regulatory hurdles that generic pharmaceutical manufacturers have to clear prior to marketing and selling generic pharmaceuticals.  Instead of filing a lengthy and costly New Drug Application, the Hatch-Waxman Act allows generic pharmaceutical manufacturers to obtain FDA approval in an expedited fashion.

46.    To obtain marketing approval for a generic pharmaceutical, an Abbreviated New Drug Application ("ANDA") must be filed with the FDA's Center for Drug Evaluation and Research, Office of Generic Drugs; "abbreviated" because so long as the ANDA includes data showing bioequivalence to the brand, the ANDA sponsor can reference efficacy data supporting approval of the brand (described in the regulations as the "Reference Listed Drug" or "RLD" for

---

[8] FDA, *Drugs@FDA Glossary of Terms*, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

short) instead of repeating all the same clinical trials.  Upon the FDA's determination that bioequivalence to the brand has been established, the ANDA will be approved and may be marketed in the United States as substitutable with the RLD.

47.     Although equivalent from a safety and efficacy standpoint, generic versions of brand name drugs are priced significantly below their brand counterparts, and because of this, they rapidly gain market share from the brand beginning immediately following launch.  Indeed, in every state, pharmacists are permitted (and in many states required) to substitute a generic product for a brand product barring a note from a doctor that the brand product must be dispensed as written.

48.     It is well established in economic literature that competition by generic products results in lower prices for drug purchasers.  In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price free from competitive market forces.  But once the first lower-priced generic enters, a brand drug rapidly loses sales due to automatic pharmacy counter substitution, and generics capture as much as 80% of the market or more within months of launch.  And as more generics become available, generic prices only decline further due to competition among generics.  These cost reductions to drug purchasers were the very legislative purpose behind the abbreviated regulatory pathway for generic approval under the Hatch Waxman Act.

49.     Generic competition, under lawful and competitive circumstances, reduces drug costs by driving down the prices of both generic versions of the brand drug and often the brand drug itself, and every year generic drugs result in hundreds of billions of dollars in savings to consumers, insurers, and other drug purchasers.

PUBLIC VERSION

50.     A Federal Trade Commission study found that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."  A mature generic market, such as the market for Glyburide, has several generic competitors.  Because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.[9]  Over time, generics' pricing nears the generic manufacturers' marginal costs.

51.     Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug. Generic competition to a single blockbuster brand drug can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others.  Indeed, one study found that the use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[10]

**2.     Prescription drug prices in the United States are governed by institutional safeguards, which are intended to keep drug prices competitive.**

52.     Ordinarily, the price for a consumer product is set by the retailer based on the amount the typical consumer is willing to pay.  But because of the unique features of the prescription drug marketplace, prescription drug pricing for most consumers is not determined

---

[9] *See, e.g.*, Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."), *available at* https://www.ftc.gov/reports/authorized-generic-drugs-short-term-effects-long-term-impact-report-federal-trade-commission; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.

[10] GPhA, GENERIC DRUG SAVINGS IN THE U.S. (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

between the retailer and the consumer.  Rather, because most consumers' prescription drug purchases are reimbursed by public or private health plans, consumer pricing for prescription drugs is determined by reimbursement agreements between these prescription drug payers, *i.e.*, health plans and their prescription benefit managers, and the pharmacies that dispense drugs to the payers' insured customers.

53.     Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC") for their drugs.  WAC prices represent the manufacturer's benchmark or reported list price.  The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for volume sales.  Manufacturers generally provide their WACs to purchasers or report them to publishers that compile that information for the market.[11]

54.     Generic drug manufacturers may charge different amounts for an equally interchangeable, *i.e.*, therapeutically equivalent, multisource drug.  But manufacturers are usually constrained in their ability to price generic drugs by the Maximum Allowable Cost ("MAC").[12]  MAC is a contractually based payment model that, in the private sector, is commonly established by a pharmacy benefits manager ("PBM"), who manages an insurance plan, and that is paid to

---

[11] At one time, payors relied on cost-based pricing metrics to reimburse pharmacies that dispensed drugs to their insured customers, paying the dispensing pharmacies an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.  Over time, however, it was learned that the list price for most generic drugs published by their manufacturers was substantially higher than the actual cost incurred by pharmacies to acquire the drugs.

[12] To define therapeutic categories, MAC pricing typically relies on the FDA's Orange Book, which lists approved prescription drugs and their therapeutic equivalents.  An "A"-rated drug is one that the FDA considers to be therapeutically equivalent to other pharmaceutically equivalent products.  *See* U.S. FDA Website, Orange Book Preface, *available at* https://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#tecode.

the pharmacies within the plan's network.[13]  A MAC price sets the upper limit that a pharmacy will be paid by the PBM for procuring and dispensing a particular generic medication.

55.     While PBMs usually do not disclose publicly which drugs they subject to MAC pricing, what the MAC price is, or what factors they apply to set MAC prices, it is believed that PBMs rely on a wide-variety of market-wide pricing information or plan-specific data.[14]  In recent years, 79% of employer prescription drug plans and 45 state Medicaid programs have been using MAC prices to control the cost of generic drugs.[15]  MAC prices give pharmacies an incentive to procure and dispense the lowest-priced drug product available for a particular multisource drug. If a generic drug is subject to MAC pricing, a pharmacy purchasing a higher-priced generic product will make less profit or potentially even lose money when it dispenses a higher-priced product.[16]

56.     MAC pricing is neither uniform, nor transparent and may be subject to frequent changes.  So whether a generic manufacturer's products are even subject to MAC pricing or how that MAC pricing is set for any particular generic drug is not easy for the manufacturers to decipher.  PBMs typically exercise control over the selection of generic medications that will be subjected to MAC pricing, and they fiercely guard the secrecy of their MAC price lists.[17]

---

[13] Academy of Managed Care Pharmacy, *Where We Stand, Maximum Allowable Cost (MAC) Pricing* (Dec. 2013), *available at* www.amcp.org/Sec.aspx?id=9287.  For the purposes of this complaint, MAC prices refer solely to prices that limit a pharmacy's reimbursement for generic drugs, not the amounts PBMs charge to the insurance plans, which may also be referred to as a MAC price.  *See* National Community Pharmacists Association, *The Need for Legislation Regarding "Maximum Allowable Cost" (MAC) Reimbursement*, *available at* http://www.ncpa.co/pdf/leg/mac-one-pager.pdf.

[14] *Id.*

[15] Express Scripts, *MAC Pricing Incents More Affordable Rx* (Feb. 24, 2016), *available at* http://lab.express-scripts.com/lab/insights/drug-options/mac-pricing-incents-more-affordable-rx.

[16] *See supra* Academy of Managed Care Pharmacy article.

[17] *See supra* National Community Pharmacists Association article.

Industry groups, like the Academy of Managed Care Pharmacy, actively oppose government regulation of MAC pricing and any efforts to disclose MAC prices or the method of calculating them.[18]

57.     By setting a ceiling for reimbursement of any particular generic drug at the pharmacy level, MAC prices indirectly affect the price at which generic drug manufacturers may sell their products to direct purchasers.  Because many generic drugs are subject to MAC pricing, generic drug manufacturers have an incentive to price their generic drug products competitively to maintain demand by pharmacies.

58.     MAC pricing can penalize the generic drug manufacturer that raises price on its own when its competitors do not.  A unilateral price increase in a competitive generic drug market that is subject to MAC pricing is likely to send buyers to a lower-price alternative.  MAC pricing has little effect if generic drug manufacturers collectively increase their prices for a multi-source drug.  First, PBMs generally permit pharmacies—who may be contractually obligated to dispense an unprofitable prescription—to challenge MAC prices under a MAC appeals process.[19]  If the price of a generic drug has been increased by the majority of generic drug manufacturers, then these MAC appeals may be successful in getting the PBM to increase the MAC price allowed.  Second, PBMs typically have a policy of revising MAC prices under certain contingencies.[20]  One large PBM, Express Scripts, for example, states that its MAC price list is frequently updated to reflect "the current market dynamics."[21]

---

[18] *See supra* Academy of Managed Care Pharmacy article.

[19] *Id.*

[20] *Id*.

[21] *See supra* Express Scripts article.

**B.    Defendants Orchestrated Their Conspiracy Through In-Person Meetings and Other Forms of Communication.**[22]

59.    During the Class Period, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Glyburide, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Glyburide.

**1.    Defendants' conspiracy was furthered by discussions held at meetings and industry events.**

60.    Defendants' conspiracy was furthered by discussions held at meetings and industry events hosted by the GPhA, HDMA, NACDS, MMCAP, and ECRM as well as other meetings and communications.

61.    In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other things:

(a)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of Glyburide in the United States;

(b)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid rigging concerning Glyburide sold in the United States;

(c)    Agreeing during those meetings, conversations, and communications to engage in market and customer allocation or bid rigging concerning Glyburide sold in the United States;

(d)    Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Glyburide sold in the United States;

---

[22] The allegations included in this section pertaining to the HDMA, MMCAP, NACDS, and ECRM are based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in *In re: Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

(e)     Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

(f)     Selling Glyburide in the United States at collusive and noncompetitive prices; and

(g)     Accepting payment for Glyburide sold in the United States at collusive and noncompetitive prices.

62.     To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through (1) trade association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

63.     These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price-fixing, and market and customer allocation scheme.

64.     The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.[23]  The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with

---

[23] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FiercePharma (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

PUBLIC VERSION

their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[24]

65.     Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Glyburide, and to engage in market and customer allocation concerning Glyburide, including, but not limited to, GPhA, the NACDS, and HDMA. In addition, Defendants regularly attended industry events hosted by the MMCAP and ECRM.

66.     The GPhA (now called the Association for Accessible Medicines) is the "nation's leading trade association for manufacturers and distributors of generic prescription drugs . . . ."[25] GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

67.     GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[26]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

68.     Defendants Aurobindo, Heritage, and Teva were regular members of the GPhA during the Class Period and Citron also attended meetings.  Regular members "are corporations,

---

[24] CTAG Website, Press Release, *40 State Attorneys General Now Plaintiffs in Federal Generic Drug Antitrust Lawsuit* (Mar. 1, 2017), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[25] GPhA, *Membership*, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership.

[26] *Id.*

partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[27]

69.     Several of Defendants' high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period:

a.     **2012 Board of Directors**: Debra Barrett, Sr. VP, Government and Public Affairs of Teva; and Jeffrey Glazer, President & CEO of Heritage; and

b.      **2013 Board of Directors**: Debra Barrett, Sr. VP, Government and Public Affairs of Teva; and Jeffrey Glazer, President & CEO of Heritage.

70.     The NACDS is a national trade association representing chain community pharmacies.  Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

71.     The HDMA (now called HDA) is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics.[28]  HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry. HDMA members during the Class Period have included Defendants Citron, Heritage, and Teva.

---

[27] *Id*.

[28] HDA, About, *available at* https://www.healthcaredistribution.org/about.

72.     According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services.  MMCAP has been delivering pharmacy and healthcare value to members since 1985.  MMCAP's membership extends across nearly every state in the nation, delivering volume buying power.  Members receive access to a full range of pharmaceuticals and other healthcare products and services; such as, medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

73.     MMCAP's Charter provides that "[i]n 1989, the Minnesota Department of Administration, an agency of the State of Minnesota, began a cooperative purchasing venture program to procure pharmaceutical products at the best price possible for the benefit of any other state interested in participating in the program . . . In 1996, the cooperative purchasing venture was named Minnesota Multistate Contracting Alliance for Pharmacy . . . and currently provide healthcare-related contracting to state and local government members located across the United State of America.  Total purchasers by MMCAP member facilities for all MMCAP programs exceed \$1 billion annually . . . ."

74.     According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

75.     At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.

77.     As set forth below, meetings and events hosted by the GPhA, HDMA, NACDS, MMCAP, and ECRM were frequently held during the Class Period and attended by high-level representatives from each Defendant, including employees with price-setting authority.

78.     For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Defendants Aurobindo, Heritage, and Teva.

79.     On February 20-22, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives of Defendants Aurobindo, Heritage, and Teva.



81.     On April 20-23, 2013 NACDS held its 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida. NACDS's  2013 Annual Meeting was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

a.     **Aurobindo:** Robert Cunard, CEO; James Grauso, EVP, NA Commercial Operations; and

b.      **Teva:** Maureen Cavanaugh, SVP and COO, North America Generics; Teri Coward, Senior Director Sales and Trade Relations; Jonathan Kafer, EVP Sales and Marketing; Jeremy Levin, President and CEO; Allan Oberman, President and CEO, Teva Americas Generics; Dave Rekenthaler, VP Sales;

82.     On June 2-5, 2013, HDMA held its 2013 Business and Leadership Conference ("BLC") in Orlando, Florida. HDMA's June 2013 BLC was attended by at least the following representatives from each of the Defendants, who were key executives for generic drug sales and pricing:

a.      **Aurobindo**: Julie Faria, Senior Manager, Sales Operations and Contact Administration;

b.      **Citron**: Karen Strelau, VP, Sales; Laura Short, Associate VP, Sales;

c.      **Heritage**: Neal O'Mara, National Accounts Manager; and Anne Sather, National Account Manager; and

d.      **Teva**: Theresa Coward, Senior Director, National Sales; Teri Sherman, Director, National Accounts; Jessica Peters, National Account Manager.

83.     On June 4-5, 2013, GPhA held a CMC Workshop meeting in Bethesda, Maryland that was attended by representatives of Defendants Aurobindo, Heritage, and Teva.

84.     On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by at least the following representatives from all four Defendants, who were key executives for generic drug sales and pricing:

a.   **Aurobindo**: Stuart Blake, Director, National Accounts; Robert Cunard, CEO; Patrick Santangelo, Senior Director, Sales; Anthony Thomassey, Director National Accounts;

b.   **Citron:** Vimal Kavuru, CEO;

c.   **Heritage**: Allen Dunehew, President/CEO; Matthew Edelson, Senior Director of Sales; Jeffrey A. Glazer (then CEO and Chairman), Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President), Gina Gramuglia, Commercial Operations; Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director, National Accounts; and

d.   **Teva:** Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Jessica Peters, Manager of Corporate Accounts; Allan Oberman, President and CEO Teva Americas Generics; Jonathan Kafer, EVP Sales and Marketing; Kayla Kelnhofer, National Account Executive; Teri Sherman, Director National Accounts.

85.   On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Defendants Aurobindo, Heritage, and Teva.

86.   On February 19-21, 2014, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives of Defendants Aurobindo, Heritage, and Teva.



88.     On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale,

Arizona. NACDS's 2014 annual meeting was attended by at least the following representatives

from all four Defendants, who were key executives for generic drug sales and pricing:

a.      **Aurobindo:** Robert Cunard, CEO; Paul McMahon, Senior Director Commercial

Operations;

b.      **Citron:** Vimal Kavuru, CEO; Laura Short, VP, Sales; Karen Strelau, EVP, Sales

& Marketing;

c.      **Heritage**: Jeffrey Glazer (then CEO and Chairman); and

d.      **Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice

President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating

Officer N.A. Generics; Allan Oberman, President and CEO Teva Americas

Generics.

89.     On May 12-15, 2014, MMCAP held its National Member Conference in

Bloomington, Minnesota.  At MMCAP's 2014 National Member Conference, topics included

"RFPs under consideration for Pharmacy," "contract evaluation," and "pharmaceutical price

increases."  At the MMCAP conference, a Heritage employee met in person and discussed price

increase strategies with a number of different competitors and was able to personally confirm

agreement to raise prices of at least one drug (Glyburide).

90.     MMCAP's May 12-15, 2014 National Member Conference was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

a.      **Heritage**: Anne Sather, Director, National Accounts.

b.      **Teva**: Nick Gerebi, National Account Manager; and

c.      **Aurobindo:** According to the State AGs, at **least** Defendant Aurobindo was also present at this meeting.

91.     On June 1-4, 2014, the HDMA held a Business Leadership Conference ("BLC") at the JW Marriott Desert Ridge in Phoenix, Arizona.  The June 1-4, 2014 BLC was attended by at least the following representatives from all four Defendants, who were key executives for generic drug sales and pricing:

a.      **Aurobindo:** Julie Faria, Senior Manager, Sales;

b.      **Citron:** Laura Short, VP, Sales; Karen Strelau, EVP, Sales & Marketing;

c.      **Heritage**: Neal O'Mara, Senior Director, National Accounts; Anne Sather, Associate Director, National Accounts; Jason Malek, then Senior Director Commercial Operations; and

d.      **Teva**: David Rekenthaler, VP, Sales, US Generics; Theresa Coward, Senior Director, Sales and Trade Relations; Daniel Driscoll, VP, Institutional Sales and Marketing; Jeff McClard, Senior Director, National Accounts; Jessica Peters, Director, National Accounts; Marco Falkin, VP, Marketing, Pricing, and Contract Operations; Nisha Patel, Director; Teri Sherman, Director, National Accounts;

92.      On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Defendants Heritage and Teva.

93.     On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by at least the following representatives from all four Defendants, who were key executives for generic drug sales and pricing:

    a.    **Aurobindo:** Robert Cunard, CEO; Tim Gustafson, Director, National Accounts; Jon Kerr, Director, National Accounts; Paul McMahon, Senior Director, Commercial Operations; Ramprasad Reddy, Chairman Aurobindo Pharma Ltd;

    b.    **Citron:** Vimal Kavuru, CEO; Laura Short, VP, Sales; Karen Strelau, EVP, Sales & Marketing;

    c.    **Heritage**: Heather Beem, National Accounts Manager, Institutional; Katie Brodowski, Associate Director Institutional Sales; Matthew Edelson, Senior Director of Sales; Jeffrey A. Glazer (then CEO and Chairman), Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President); Gina Gramuglia, Commercial Operations; Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director National Accounts; and

    d.    **Teva**: David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Kevin Galowina, Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Nisha Patel, Director of National Accounts; Jocelyn Bajer, Director National Accounts; Theresa Coward, Sr. Director Sales and Trade Relations; Kayla Kelnhofer, National Account Executive; Tim McFadden, VP Marketing;

94.     On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants, including Aurobindo, Citron, Heritage, and Teva.

95.     In 2015, and 2016, Defendants continued to regularly attend trade association meetings, conferences and events, including: (i) the February 9-11, 2015 GPhA Annual Meeting in Miami, Florida; (ii) ███████████████████████████████████████████ ██████████████████████████████████████████████████ (iii) the April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida; (iv) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (v) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (vi) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (vii) the November 2-4, 2015 GPhA meeting in Bethesda, Maryland; (viii) the April 10-14, 2015 MMCAP meeting in Minneapolis, Minnesota; (ix) the April 16-19, 2016 NACDS Annual Meeting in Palm Beach Florida; (x) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; and (xi) the August 6-9, 2016, NACDS 2016 Total Store Expo in Boston, Massachusetts.

96.     As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.  Defendants' employees used these

opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.[29]

97.     In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[30]

98.     A large number of generic drug manufacturers, including Defendants Aurobindo, Citron, Heritage, and Teva are headquartered or have major offices in close proximity to one another in New Jersey, New York, and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

99.     Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.  During these GNOs, meetings and dinners, these employees meet with their competitors and discuss competitively sensitive information.  For example, several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

---

[29] *See, e.g.*, *State of Connecticut et al. v. Aurobindo et al.* (D. Conn.), at ¶ ¶ 50-52, *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf
[30] *Id.* at ¶¶ 53-60.

100.    Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

101.    Defendants also routinely communicate and share information with each other about bids and pricing strategy. This can include forwarding bid packages received from a customer (*e.g*., a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

102.    Additionally, Defendants share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

**2.    Defendants' specific anticompetitive communications and activities.**

103.    Defendant Heritage led the Glyburide conspiracy, and its executives Glazer and Malek coordinated and monitored Defendants' actions.

104.    On or about April 22, 2014, Heritage held a teleconference during which Malek identified a large number of drugs that Heritage had targeted for price increases or other collusive activity, including Glyburide. On the call, Malek discussed the need to coordinate pricing with Heritage's competitors in the markets for these various generic drugs. At the time of this call, Aurobindo and Teva were Heritage's only competitors in the Glyburide market.

105.    After the call, Malek instructed members of the Heritage sales team to reach out to their contacts at Aurobindo and Teva immediately in an attempt to reach agreements on pricing for Glyburide.

106.     Malek was responsible for communicating with Teva, which competed with Heritage in the markets for several generic drugs, including Glyburide.  Malek made direct contact with a representative at Teva to discuss pricing for Glyburide, among other generic drugs.  Ultimately, Malek and Teva's representative reached an agreement to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation for Glyburide and other generic drugs.

107.     Malek and Glazer sent emails to their employees imploring them to reach agreements with their competitors in the Glyburide market, among others, as soon as possible. For example, on April 28, 2014, Malek sent an email to a Heritage employee concerning the status of discussions with Aurobindo.  Glazer followed up the next day with an email to that same employee requesting further information, and Malek sent an additional email on April 30, 2014 requesting an update.

108.     On May 9, 2014, Heritage held another teleconference with its employees to discuss the contemplated pricing for Glyburide, among other generic drugs.

109.     The following week, a Heritage employee met and discussed pricing and other strategies with several competitors at the MMCAP.  During that meeting, that Heritage employee agreed with her counterpart at Aurobindo that they would coordinate on pricing and other strategies related to Glyburide.  On May 15, 2014, the same Heritage employee emailed Malek confirming this agreement.

110.     On June 23, 2014, Heritage employees met and discussed pricing and other strategies on certain generic drugs, including Glyburide.  They reached a consensus that they would attempt to raise glyburide prices by 200%.

111.    Over the next several weeks, Heritage employees continued reaching out to numerous generic drug competitors to secure agreements to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning Glyburide and other generic drugs

112.    Heritage's competitor outreach extended to incoming entrants in the Glyburide market to ensure that these new competitors would not engage in price competition or other competitive strategies to steal share from the incumbent manufacturers.  For example, on June 25, 2014, one Heritage employee contacted her friend, an employee of Defendant Citron, to discuss whether Citron would be selling Glyburide in the near future.  Once it was determined that Citron would be entering the Glyburide market (through a manufacturing partnership with Aurobindo), Heritage employees had extensive phone, text message, and in-person conversations with Citron employees concerning Citron's Glyburide pricing and other strategies.

113.    While these discussions with Citron were ongoing, Malek continued to push Heritage's employees to communicate with Heritage's other competitors—both in the Glyburide market and other generic drug markets—in order to maintain existing agreements on pricing and other strategies, as well as reach new ones.

114.    These are only examples of Defendants' anticompetitive conduct concerning Glyburide and other generic drugs.

115.    In coordinating and effectuating their conspiracy concerning Glyburide and other generic drugs, Heritage and other Defendants consciously avoided using emails or other forms of communications that could later be subject to discovery.  For example, shortly after a text message exchange between Citron and Heritage employees, in which the two companies agreed on pricing and other strategies for Glyburide, one Citron employee told her counterpart at

Heritage that Heritage employees should not communicate with Citron through email, but instead should call a designated person at Citron if they had any information to share.

**C.     Defendants' Conduct in Generic Drug Pricing Is Under Investigation by the United States Congress, the DOJ, and the State Attorneys General.**

   **1.     Congress launched an investigation in response to news reports of a dramatic rise in price of certain generic drugs.**

116.    As noted above, in January 2014 the NCPA sent correspondence to the United States Senate HELP Committee and the United States House Energy and Commerce Committee requesting hearings on significant spikes in generic pharmaceutical pricing.

117.    On October 2, 2014, Senator Bernie Sanders (I-VT), Chair of the Subcommittee on Primary Health and Aging, Senate Committee on Health, Education, Labor and Pensions, and Representative Elijah E. Cummings (D-MD), the Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers requesting information about the escalating prices of generic drugs used to treat everything from common medical conditions to life-threatening illnesses.[31]

118.    Senator Sanders and Representative Cummings issued a joint press release, advising "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses."  They noted the "huge upswings in generic drug prices that are hurting patients" are having a "'very significant'" impact threatening pharmacists' ability to remain in business.[32]

---

[31] U.S. Senator Bernie Sanders Website, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[32] *Id.*

119.    On February 24, 2015, Senator Sanders and Representative Cummings sent a

letter requesting that the Office of the Inspector General ("OIG") of the Department of Health

and Human Services "examine recent increases in the prices being charged for generic drugs and

the effect these price increases have had on generic drug spending within the Medicare and

Medicaid programs."[33]  The OIG responded to the request on April 13, 2015, advising it would

examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly

[Average Manufacturer Pricing] exceeded the specified inflation factor."[34]

### 2.    The DOJ launched a broad criminal investigation into anticompetitive conduct by generic drug manufacturers.

120.    The DOJ opened a criminal investigation into collusion in the generic

pharmaceutical industry on or around November 3, 2014.  The DOJ also empaneled a grand jury

in this District at about the same time.

121.    Initial reports suggest that, at the beginning, the DOJ's probe was focused on two

generic drugs: digoxin and doxycycline.  However, news reports, court filings, and other public

statements have confirmed the sweeping nature of the DOJ's investigation.  Reportedly, the DOJ

believes price-fixing between makers of generic pharmaceuticals is widespread, and its

investigation could become the next auto parts investigation, which is the DOJ's largest

prosecution to date.[35]  According to sources cited by Bloomberg, the DOJ investigation already

---

[33] Letter from Sen. Bernard Sanders & Rep. Elijah E. Cummings, U.S. Cong., to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[34] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Sen. Bernard Sanders (Apr. 13, 2015), *available at* http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

[35] Joshua Sisco, *DoJ believes collusion over generic drug prices widespread—source*, Policy and Regulatory Report (June 26, 2015), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

"spans more than a dozen companies and about two dozen drugs."[36]  As noted elsewhere herein, the DOJ's investigation has yielded criminal guilty pleas from Glazer and Malek of Heritage concerning Glyburide.

122.    In addition to Heritage, other Defendants here have been ensnared in the DOJ's ongoing probe:

123.    **Citron:** On December 21, 2016, Aceto, a company which purchased Citron's generic assets in December 2016, disclosed that in June 2016, the DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ."[37]  Aceto also disclosed that in September 2016, the CTAG requested that Citron produce all documents produced to DOJ.[38]

124.    **Teva**: On August 4, 2016, Teva disclosed in an SEC filing that it received a subpoena from the DOJ on June 21, 2015, "seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[39]  Teva also disclosed that on July 12, 2016, it also "received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."[40]

---

[36] David McLaughlin and Caroline Chen, *U.S. Charges in Generic Drug Probe to be Filed by Year-End*, BLOOMBERG (Nov. 3, 2016), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[37] Aceto SEC Form 8-K, Ex. 99.5.

[38] *Id.*

[39] Teva SEC Form 6-K at 25 (Aug. 4, 2016).

[40] *Id.*

PUBLIC VERSION

125.     Defendants are not alone.  Numerous other generic manufacturers have likewise received subpoenas in connection with the DOJ and the State AG's broad investigations into anticompetitive conduct in the generic drug industry.  Additionally, some of these generic manufacturers have disclosed that search warrants have been executed or that certain employees have been separately subpoenaed as part of these ongoing probes.

126.     The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual.  Section F.1 of that chapter notes that when deciding whether to request the initiation of a grand jury investigation "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[41]  The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division.[42]  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General.  If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation."[43]  "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[44]

---

[41] DOJ, ANTITRUST DIVISION MANUAL (5th ed. 2015) at III-82.

[42] *Id.*

[43] *Id.* at III-83.

[44] *Id.*

127.    Receipt of federal grand jury subpoenas is an indication that antitrust offenses have occurred.

128.    That a target has reportedly applied for leniency is also significant.[45]  As the DOJ notes on its web site (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price-fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

The DOJ further provides that the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials." *Id.*

129.    The DOJ's first charges were made on December 12, 2016, against two generic industry executives (Glazer and Malek) with criminal counts related to price collusion for Glyburide and doxycycline.  *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-

---

[45] Leah Nylen and Josh Sisco, *Generic drug investigation started small before ballooning to dozen companies*, MLEX (Nov. 4, 2016) ("While the Justice Department didn't have a whistleblower at the beginning of the investigation, it is understood that [in the summer of 2016] a company applied for leniency, which grants full immunity to the first company to come forward and admit to cartel violations."), *available at* http://www.mlex.com/GlobalAntitrust/DetailView.aspx?cid=841053&siteid=191&rdir=1.

00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).

130.    These cases allege that these former senior executives of generic drug maker Heritage Pharmaceuticals Inc. violated Section 1 of the Sherman Act by participating in conspiracies to fix prices, rig bids and engage in market and customer allocation for Glyburide and generic doxycycline.  On January 9, 2017, both Glazer and Malek pleaded guilty to the charges.  The DOJ charges mention that Glazer and Malek's co-conspirators included "individuals that [Glazer] supervised at his company and those he reported to at his company's parent[.]"[46]  Sentencing for both Glazer and Malek was originally set for April 2017 but was later rescheduled to September 2017 as they continue to cooperate with the DOJ.

131.    The DOJ has intervened in MDL 2724 as well as numerous civil antitrust actions alleging price-fixing, bid rigging, and market and customer allocation of generic pharmaceuticals stating that these cases overlap with the DOJ's ongoing criminal investigation.  For example, in a civil antitrust action related to the generic pharmaceutical propranolol, the DOJ intervened and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Glazer and Malek] informations that were unsealed."[47]  The DOJ filed a brief with the United States Judicial Panel on Multidistrict Litigation noting that, "The complaints in those civil cases – which typically allege that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by

---

[46] Transcript of Jan. 9, 2017 Plea Hearing, *United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS, ECF 24 at 19 (E.D. Pa.).  A similar statement appears in the transcript from Malek's plea hearing.

[47] *See* Transcript of Hearing, *FWK Holdings, LLC v. Actavis Elizabeth, LLC*, No. 16-cv-9901, ECF 112 (S.D.N.Y. Feb. 21, 2017).

conspiring to fix prices and allocate customers for a particular drug – overlap significantly with aspects of the ongoing criminal investigation."[48]  As noted above, the DOJ also filed a motion for a stay of discovery in MDL 2724 stating that: "Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (including a significant number of the drugs at issue here)."[49]

132.    The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines.  The Division's investigation into the generics market, however, has revealed that some executives have sought to collude on prices and enrich themselves at the expense of American consumers.[50]

**3.    Led by the State of Connecticut, 45 attorneys general launched their own investigation of antitrust violations in the generic drug industry.**

133.    The State AGs' action was filed just days after the DOJ filed its first criminal charges against two former executives of Heritage Pharmaceuticals.  According to the State AGs' complaint, the information developed through its investigation (which is still ongoing) uncovered evidence of a broad, well-coordinated, and long-running series of schemes to fix prices and allocate markets for a number of generic pharmaceuticals in the United States.  Although the State AGs' action currently focuses on Glyburide and doxycycline, it alleges that

---

[48] *See* Memorandum of Amicus Curiae United States of America Concerning Consolidation, *In re: Generic Digoxin and Doxycycline Antitrust Litig.*, MDL No. 2724, ECF 284 (J.P.M.L. Mar. 10, 2017).

[49] *See* Intervenor United States' Motion to Stay Discovery, *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).

[50] DOJ Website, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

the Plaintiff States have uncovered a wide-ranging series of conspiracies implicating numerous

different generic pharmaceuticals and competitors.  As reported by *The Connecticut Mirror*, the

State AGs "suspected fraud on a broader, nearly unimaginable scale" and "new subpoenas are

going out, and the investigation is growing beyond the companies named in the suit."[51]  CTAG

George Jepsen has called evidence that has so far been obtained in the State AGs' investigation

"mind-boggling."[52]

134.  CTAG George Jepsen confirmed the scope of the State AGs' action in the

following press release:

> My office has dedicated significant resources to this investigation
> for more than two years and has developed compelling evidence of
> collusion and anticompetitive conduct across many companies that
> manufacture and market generic drugs in the United States. . . .
> While the principal architect of the conspiracies addressed in this
> lawsuit was Heritage Pharmaceuticals, we have evidence of
> widespread participation in illegal conspiracies across the generic
> drug industry. Ultimately, it was consumers – and, indeed, our
> healthcare system as a whole – who paid for these actions through
> artificially high prices for generic drugs. We intend to pursue this
> and other enforcement actions aggressively, and look forward to
> working with our colleagues across the country to restore
> competition and integrity to this important market.[53]

135.  In filings with the United States Judicial Panel on Multidistrict Litigation on May

16, 2017 and June 13, 2017, the State AGs reiterated that their ongoing investigation is broad in

---

[51] Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, The Connecticut Mirror (Jan. 27, 2017), *available at* https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/. *The Connecticut Mirror* further reported that the DOJ grand jury was convened in this District shortly after the CTAG issued its first subpoena. *Id.*

[52] *Id.*

[53] CTAG Website, Press Release, *Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies* (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

scope and goes beyond doxycycline hyclate DR and glyburide.[54]  The State AGs further stated

that their doxycycline hyclate DR and glyburide action "encompass[es] illegal agreements –

including with regard to Doxy DR – where prices remained constant (or remained higher than

they would have been in a competitive market) as a result of customer or market allocation

agreements designed specifically to avoid price erosion[.]"  The State AGs also disclosed that

they have entered into settlements with Glazer and Malek and that these settlements require

Glazer and Malek's cooperation with the State AGs.

136.    During a conference call on July 27, 2017, W. Joseph Nielsen, an assistant AG for

the State of Connecticut, said "he expects future actions by the group of states investigating

price-fixing and market allocation in the generic drug industry" including "more lawsuits against

additional generic manufacturers for additional drugs [and] lawsuits against high-level

executives for their roles in the collusion."[55]  Nielsen also stated that the States AGs realized

very quickly that the generic drug industry is "set up structurally in a way that fosters and

promotes collusion among generic competitors" and that the State AGs' investigation "has

expanded greatly to the point where we are now looking at numerous drugs."

137.    New York AG Eric T. Schneiderman also reported that the State AGs' action

"uncovered evidence of a broad, well-coordinated and long running series of conspiracies to fix

prices and allocate markets for certain generic pharmaceuticals in the United States."[56]

---

[54] *See* Brief and Reply in Support of Plaintiff States' Motion to Vacate Conditional
Transfer Order (CTO-3), *In re: Generic Pharm. Pricing Antitrust Litig.*, MDL No. 2724, ECF
321 & 334 (J.P.M.L. May 16, 2017 & June 13, 2017).

[55] Can Calik, *Future actions by state enforcers expected over generic drug collusion,
Connecticut official says*, MLEX (July 27, 2017), *available at*
http://www.mlex.com/GlobalAntitrust/DetailView.aspx?cid=908454&siteid=191&rdir=1.

[56] New York AG Website, Press Release, *A.G. Schneiderman Files Federal Antitrust
Lawsuit With 19 Other States Against Heritage Pharmaceuticals And Other Generic Drug*

138.    The DOJ's and State AGs' investigations of alleged price-fixing and other

unlawful conduct in the generic pharmaceutical industry are ongoing.

## VI.    THE GLYBURIDE MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION

139.    Because Defendants' anticompetitive conduct constitutes a conspiracy to fix

prices, which is a *per se* violation of Section 1 of the Sherman Antitrust Act, Plaintiffs need not

define a relevant market.  However, there are features of the market relevant to this case that

show both (i) that the market is susceptible to collusion and (ii) that the price increases were in

fact the result of collusion and not the result of conscious parallelism.

140.    Factors showing that a market is susceptible to collusion include in this case:

(1)    **High Level of Industry Concentration** – A small number
of competitors (Defendants) control a significant market
share for Glyburide.

(2)    **Sufficient Numbers to Drive Competition** – While the
market for Glyburide had a small enough number of
competitors to foster collusion, the number of sellers was
large enough that – given decades of experience with
competitive generic pricing, and accepted models of how
generic companies vigorously compete on price – one
would have expected prices to remain at their historical,
near marginal cost levels.  With the number of generic
competitors such as there were here, historical fact and
accepted economics teaches that – absent collusion – prices
would have remained at competitive levels.

(3)    **High Barriers to Entry** – The high costs of manufacture,
intellectual property, development and testing
requirements, and lengthy time delay, related to regulatory
approval and oversight are among the barriers to entry in
the generic drug market.  For example, the four Defendants
each sell Glyburide pursuant to FDA approvals granted
years before the Class Period. Any potential new entrant
would have to go through the lengthy ANDA-approval
process before coming to market, a process that takes many
months, and often years. By insulating against new

---

*Companies* (Dec. 15, 2016), *available at* https://ag.ny.gov/press-release/ag-schneiderman-files-federal-antitrust-lawsuit-19-other-states-against-heritage.

entrants, these barriers to entry and others increase the market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

(4)    **High Inelasticity of Demand and Lack of Substitutes** – For the majority of patients who rely on it, Glyburide is a necessity that must be purchased regardless of price hikes. While there are other drugs on the market for the treatment of high blood sugar, there are significant barriers to changing treatments, and both patients and physicians are likely to prioritize medical considerations over price. This makes demand for Glyburide highly inelastic

(5)    **Commoditized Market** – Defendants' Glyburide products are fully interchangeable because they are bioequivalent to one another by FDA standards.  Thus, all manufactured versions of Glyburide are therapeutically equivalent to each other and pharmacists may substitute one for another interchangeably.

(6)    **Absence of Non-Conspiring Competitors** – Defendants have maintained supracompetitive pricing for Glyburide throughout the Class Period.  Defendants have market power in the market for Glyburide, which enables them to increase prices or maintain supracompetitive pricing without loss of market share to non-conspirators.

(7)    **Opportunities for Contact and Communication Among Competitors** – Defendants participate in the committees and events of the GPhA, HDMA, MMCAP, NACDS, ECRM, NPF, and other industry groups, which provide and promote opportunities to communicate.  The grand jury subpoenas to Defendants targeting inter-Defendant communications, further supports the existence of communication lines between competitors with respect to, among other things, generic pricing.

(8)    **Reimbursement of Generic Drugs** – This market, as with many generic markets, has institutional features that would inhibit price collusion.  The reimbursement for generic pharmaceuticals to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical paid by retail pharmacies purchasing from a wholesaler for each of a pharmaceutical's generic equivalent versions.  As a result, the usual inhibition of an oligopolist to unilaterally raise prices – or to maintain supracompetitive prices in a multi-

competitor market -- is embedded in the generic
reimbursement system.

141.     Through their market dominance, Defendants have been able to substantially

foreclose the market to rival competition, thereby maintaining and enhancing market power and

enabling Defendants to charge Plaintiffs and the proposed Class members inflated prices above

competitive levels for Glyburide through unlawful price collusion.

## VII.   CLASS ACTION ALLEGATIONS

142.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this

action on behalf of a Class defined as:

> All persons or entities that directly purchased generic Glyburide
> (glyburide 1.25, 2.5, or 5 mg tablets) from one or more of the
> Defendants in the United States and its territories and possessions at
> any time during the period from April 2014 through the present (the
> "Class Period").
>
> Excluded from the Class are Defendants and their officers, directors,
> management, employees, subsidiaries, or affiliates, judicial officers
> and their personnel, and all governmental entities.

143.     Members of the Class are so numerous that joinder is impracticable.  Plaintiffs

believe that there are dozens of Class members, geographically dispersed throughout the United

States, such that joinder of all Class members is impracticable.  Further, the Class members are

readily identifiable from information and records maintained by Defendants.

144.     Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other

Class members, and there are no material conflicts with any other member of the Class that

would make class certification inappropriate.  Plaintiffs and all members of the Class were

damaged by the same wrongful conduct of Defendants.

145.     Plaintiffs will fairly and adequately protect and represent the interests of the Class

and Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

146.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

147.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.  Thus, determining damages with respect to the Class as a whole is appropriate.  The common applicability of the relevant facts to claims of Plaintiffs and the proposed class is inherent in Defendants' wrongful conduct, because the overcharge injuries incurred by Plaintiffs and each member of the proposed class arose from the same collusive conduct alleged herein.

148.     The common legal and factual questions do not vary among Class members and may be determined without reference to individual circumstances, and include, but are not limited to, the following:

(a)     Whether Defendants and their co-conspirators participated in a scheme to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation for Glyburide in the United States;

(b)     The duration and extent of the alleged contract, combination, or conspiracy between and among Defendants and their co-conspirators;

(c)     Whether Defendants and their co-conspirators were participants in the contract, combination, or conspiracy alleged herein;

(d)     The effect of the contract, combination, or conspiracy on the prices of Glyburide in the United States during the Class Period;

(e)     Whether Defendants' conduct caused supracompetitive prices for Glyburide;

(f)     Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiffs and other members of the Class; and

(g)     Whether the alleged contract, combination, or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

149.    Treatment as a class action is the superior method for the fair and efficient adjudication of this controversy, as it will permit numerous similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, avoiding unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding as a class action, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

150.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.    ANTITRUST INJURY

151.    During the Class Period, Plaintiffs and Class members directly purchased Glyburide from Defendants.  Because of the Defendants' anticompetitive conduct, Plaintiffs and Class members were forced to pay more for Glyburide than they otherwise would have, and thus have suffered substantial overcharge damages at the hands of Defendants.  This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

152.    Defendants' unlawful conduct has successfully eliminated competition in the market, and Plaintiffs and Class members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants.  The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

153.    Defendants, through their unlawful conduct alleged herein, reduced competition in the Glyburide market, fixed prices, reduced choice for purchasers, and caused antitrust injury to purchasers in the form of overcharges.

154.    Because Defendants' anticompetitive conduct is ongoing, Plaintiffs and the Class continue to pay supracompetitive prices for Glyburide through the present.

- 46 -

## IX.    CLAIM FOR RELIEF – VIOLATION OF SECTION 1 OF THE SHERMAN ACT

155.    Plaintiffs repeat and re-allege the foregoing as though fully set forth herein.

156.    In violation of Section 1 of the Sherman Antitrust Act, Defendants entered agreements with one another concerning the pricing of Glyburide in the United States.  This conspiracy was *per se* unlawful price-fixing.

157.    Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts were intentional, were directed at the sales of Glyburide in the United States, and had a substantial and foreseeable effect on interstate commerce by raising and fixing Glyburide prices throughout the United States.

158.    The conspiracy had its intended effect, because Defendants have benefited—and continue to benefit—from their collusion and the elimination of competition, both of which artificially fixed prices of Glyburide.

159.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

a.    Prices charged to and paid by Plaintiffs for Glyburide were artificially raised, fixed, maintained, or stabilized at supracompetitive levels;

b.    Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the sale of Glyburide in the United States market; and

c.    Competition in establishing the prices paid for Glyburide was unlawfully restrained, suppressed, or eliminated.

160.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their business and property in that they have paid more for Glyburide than they otherwise would have paid in the absence of Defendants' unlawful conduct.

The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

161.    Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

162.    There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect.  Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

163.    Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class members pray for relief from this Court and request:

A.    Certification as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.    Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.    A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiffs and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

D.    An award to Plaintiffs and Class members of pre-judgment and post-judgment interest at the highest legal rate provided by law from and after the date of service of the first-filed Complaint in this action;

E.    An award to Plaintiffs and Class members of the costs of this suit, including reasonable attorney fees; and

PUBLIC VERSION

F.      An award of any further relief as the Court deems just and proper.

## XI.    JURY TRIAL DEMANDED

Plaintiffs hereby request a jury trial on all claims so triable.

Dated August 15, 2017

NASTLAW LLC

By: _____
Dianne M. Nast

Dianne M. Nast (PA Bar No. 24424)
Erin C. Burns (PA Bar No. 89742)
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107
215-923-9300
215-923-9302 (fax)
dnast@nastlaw.com
eburns@nastlaw.com

*LEAD AND LIAISON COUNSEL*

BERGER & MONTAGUE P.C.
David F. Sorensen
Zachary D. Caplan
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000
dsorensen@bm.net
zcaplan@bm.net

KAPLAN FOX & KILSHEIMER LLP
Robert N. Kaplan
Elana Katcher
850 Third Avenue
New York, New York 10022
(212) 687-1980
rkaplan@kaplanfox.com
ekatcher@kaplanfox.com

ROBERTS LAW FIRM P.A.
Michael L. Roberts
Jana K. Law
20 Rahling Circle
Little Rock, Arkansas 72223
(501) 821-5575
mikeroberts@robertslawfirm.us
janalaw@robertslawfirm.us

HAGENS BERMAN SOBOL SHAPIRO LLP
Thomas M. Sobol
David S. Nalven
55 Cambridge Parkway, Suite 301
Cambridge, Massachusetts  02142
617-482-3700
tom@hbsslaw.com
davidn@hbsslaw.com

Barbara A. Mahoney
1918 8th Avenue, Suite 3300
Seattle, Washington 98101
(206) 623-7292
bmahoney@hbsslaw.com

NUSSBAUM LAW GROUP P.C.
Linda P. Nussbaum
Bradley J. Demuth
1211 Avenue of the Americas, 40th Floor
New York, New York 10036
(917) 438-9102
lnussbaum@nusspaumpc.com
bdemuth@nussbaumpc.com

*DIRECT PURCHASER PLAINTIFFS' STEERING COMMITTEE*

COHEN MILSTEIN SELLERS &
TOLL PLLC
Sharon K. Robertson
Donna M. Evans
88 Pine Street, 14th Floor
New York, New York 10005
(212) 838-7797
srobertson@cohenmilstein.com
devans@cohenmilstein.com

GUSTAFSON GLUEK PLLC
Daniel E. Gustafson
Daniel C. Hedlund
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, Minnesota 55402
(612) 333-8844
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

SALTZ MONGELUZZI BARRETT &
BENDESKY P.C.
Simon B. Paris
Patrick Howard
One Liberty Place, 52nd Floor
Philadelphia, Pennsylvania 19103
(215) 496-8282
sparis@smbb.com
phoward@smbb.com

VANEK, VICKERS & MASINI P.C.
Joseph M. Vanek
David P. Germaine
55 West Monroe, Suite 3500
Chicago, Illinois 60603
(312) 224-1500
jvanek@vaneklaw.com
dgermaine@vaneklaw.com

ZIMMERMAN REED LLP
Charles S. Zimmerman
David M. Cialkowski
1100 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
(612) 341-0400
charles.zimmerman@zimmreed.com
david.cialkowski@zimmreed.com

FARUQI & FARUQI LLP
Peter Kohn
Joseph T. Lukens
101 Greenwood Avenue, Suite 600
Jenkintown, Pennsylvania 19046
(215) 277-5770
pkohn@faruqilaw.com
jlukens@faruqilaw.com

RADICE LAW FIRM
John D. Radice
April D. Lambert
34 Sunset Blvd
Long Beach, New Jersey  08008
(646) 245-8502
jradice@radicelawfirm.com
alambert@radiclawfirm.com

TAUS, CEBULASH & LANDAU LLP
Barry S. Taus
Kevin Landau
80 Maiden Lane, Suite 1204
New York, New York 10038
(212) 931-0704
btaus@tcllaw.com
klandau@tcllaw.com

WEXLER WALLACE LLP
Kenneth A. Wexler
Bethany R. Turke
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 346-2222
kaw@wexlerwallace.com
brt@wexlerwallace.com

***ADDITIONAL COUNSEL TO DIRECT PURCHASER PLAINTIFFS***

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2017, a copy of the Consolidated Direct Purchaser Class Action Complaint was manually filed under seal with the Clerk of the Court and served upon counsel of record via electronic mail.

Dianne M. Nast